UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD STAPLES and
BERNTINA STAPLES,

                Plaintiffs,

v.

UNITED STATES OF AMERICA,

                Defendant.

_____/

Case No. 19-11974

Paul D. Borman
United States District Judge

## OPINION AND ORDER DENYING PLAINTIFF'S CORRECTED MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (ECF NO. 30)

This is a medical malpractice case brought by a veteran, Plaintiff Ronald Staples, and his wife, Berntina Staples, against the United States through the Federal Tort Claims Act, for care Mr. Staples received at a United States Department of Veterans Affairs hospital in Detroit. The case is centered on a week-long period in 2016 during which Plaintiff was hospitalized and then diagnosed with a partial colon, or large bowel, obstruction of unknown etiology. Now before the Court is Plaintiff's Corrected Motion for Partial Summary Judgment, which argues that there is no genuine issue of material fact that Defendant breached the standard of care with respect to the performance of a second sigmoidoscopy procedure on Plaintiff on November 4, 2016, and with respect to obtaining Plaintiff's informed consent for

that procedure. (ECF No. 30). The Court finds that the briefing adequately addresses the issues in contention and dispenses with a hearing pursuant to E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, the Court DENIES Plaintiff's Corrected Motion for Partial Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. Saturday, October 29, 2016

Plaintiff Ronald Staples went to the Detroit VA Hospital emergency room on Saturday, October 29, 2016, complaining of having stomach pain and difficulty going to the bathroom. (ECF No. 31-2, Deposition of Ronald Staples (R. Staples Dep.) at p. 9, PageID.559.) Plaintiff had a CT scan of his abdomen and pelvis. (ECF No. 31-3, Radiology Records, PageID.645-47) The imaging revealed a distended colon, "raising concern for mass causing partial obstruction[.]" (*Id.*) Dr. Kaitlin Woolley performed a surgical consult, including a review of the CT scan results and an examination of Plaintiff. (ECF No. 31-4, First Surgical Consult, PageID.648-50.) Dr. Woolley concluded that emergency surgery was not required, and that the problem could be an obstruction (ileus), inflammatory bowel disease, or a stomach issue (gastroparesis). (*Id.*) Dr. Woolley wrote that Plaintiff would need a

colonoscopy, and recommended a GI consult, serial abdominal exams, and admission to the hospital. (*Id.*) Plaintiff was admitted to the hospital.

### 2.      Sunday, October 30, 2016

The morning of October 30, 2016, Dr. Gamal Mostafa, the hospital's head of surgery, added an addendum to Dr. Woolley's October 29, 2016, note, stating that he was also concerned about an obstruction and that he was transferring Plaintiff to the surgical service and ordering a CT scan with rectal contrast "asap to gauge the degree of colonic obstruction or otherwise rule it out." (*Id.* PageID.650.) Dr. Mostafa noted that if the CT scan showed a pathologic lesion, he wanted Plaintiff cleared for surgery. (*Id.*)

The October 30th CT imaging was "concerning for partial colon obstruction" and "concerning for apple core lesion related to colon carcinoma[.]" (Radiology Records, PageID.643-45.) The radiologist recommended a colonoscopy. (*Id.*)

Dr. Suhag Patel performed a gastroenterology consult after this second CT imaging. (ECF No. 31-5, Progress Notes, PageID.703-06.) Dr. Patel noted that Plaintiff's lack of weight loss, bleeding (hematochezia), or family history of cancer would make a colon cancer unusual, and that irritable bowel disease and a volvulus (a twist in the colon) were possible, but also seemed unlikely. (*Id.* at PageID.706.) Dr. Patel agreed with Plaintiff's transfer to the surgical service and suggested that a

3

sigmoidoscopy (a procedure similar to a colonoscopy) be considered. (*Id*.) Dr. Patel discussed the case with Chief Gastroenterologist Dr. Philip Schoenfeld, who agreed with the assessment and plan as outlined. (*Id*.)

Later that evening, Dr. Mostafa added a note stating that "CT confirms left-sided colonic obstructive lesion (likely malignant, poss obstructive pattern of divertic dis[ease])" and that he would plan for surgery, but was also considering a gastrografin enema to exclude additional lesions. (*Id*. at PageID.710.) Dr. Mostafa requested that gastroenterology place a metal stent in the colon as a temporizing measure to reduce pressure and prepare the colon for surgery by allowing gas and stool to flow past the obstruction. (ECF No. 31-6, Deposition of Gamal Mostafa, M.D. (Mostafa Dep.) at p. 30, PageID.741; ECF No. 31-7, Deposition of Philip Schoenfeld, M.D. (Schoenfeld Dep.) at pp. 29-30, PageID.808-09.) Because the stent requested was a specialized stent, the VA hospital had to order it, and it did not arrive until Wednesday morning. (Schoenfeld Dep. at pp. 16-17, PageID.795-96.)

### 3. Monday, October 31, 2016

Additional abdominal imaging taken early Monday morning continued to be concerning for cancer (neoplasm). (Radiology Records, PageID.642-43.) Dr. Mostafa, Dr. Jason Rizquallah, the senior surgical resident, and a surgical nurse practitioner, Kathleen Cobb, met with Plaintiff and his wife on Monday. (Progress

4

Notes, PageID.702.) They informed Plaintiff that he needed to have surgery to remove the portion of the colon obstructed by the mass, and that there was a "high likelihood" that the mass was cancerous. (*Id*.) Plaintiff, however, after reviewing the record, testified in his deposition that Dr. Mostafa never told him that there was a high likelihood that the mass was cancerous. (R. Staples Dep. at pp. 17-18, PageID.567-68.)

Dr. Maher Tama performed a daily GI consult and noted that the GI team was willing to provide a flexible sigmoidoscopy with a potential stent on Wednesday, November 2, 2016. (Progress Notes, PageID.699-701.) Dr. Schoenfeld added an addendum, noting that the case was discussed in detail on GI rounds, that Plaintiff was examined and he and his wife had been interviewed, and that Dr. Schoenfeld agreed with Dr. Mostafa's plan as outlined. (*Id*.)

### 4. Tuesday, November 1, 2016

Dr. Jack Trebelhorn, a surgeon, noted that an "extensive discussion was had with patient on rounds today about the need for surgery as he has a stricture in his colon that is causing massive bowel distension which will eventually lead to a bowel injury." (Progress Notes, PageID.683-84.) Plaintiff told Dr. Trebelhorn that "he was disinterested in surgery at the time but would 'think about it.'" (*Id.*) Dr. Trebelhorn noted that the "importance of surgery was again reinforced." (*Id*.) Dr. Trebelhorn

further noted that the "[i]mportance of surgery discussed extensively with patient[.]" (*Id.* at PageID.686.) Plaintiff testified that he had no memory of any conversation with Dr. Trebelhorn. (R. Staples Dep. at pp. 22-23, PageID.572-73.)

Dr. Walter Salwen, another surgeon, examined Plaintiff at the request of Dr. Mostafa and "totally agree[d]" with Dr. Mostafa's assessment that surgery was necessary and that the blockage was "almost certainly malignant in nature." (Progress Notes, PageID.692-93.) Dr. Salwen noted that Plaintiff "seems to understand the potential disaster if nothing is done." (*Id.*)

Dr. Bashar Mohamad performed the daily GI consult and noted that the GI team would perform the sigmoidoscopy and attempt to place the stent on Wednesday. (*Id.* at PageID.687-90.) Dr. Schoenfeld interviewed Plaintiff on GI rounds and addressed Plaintiff's questions. (*Id.* at PageID.691.)

### 5.   Wednesday, November 2

The sigmoidoscopy was performed on Plaintiff on Wednesday, November 2nd. (Progress Notes, PageID.681-82.) Dr. Fadi Antaki, a gastroenterologist, obtained an informed consent from Plaintiff prior to the procedure. (ECF No. 31-8, 11/2/2016 Consent Form, PageID.863-67.) Dr. Antaki recalled having a detailed conversation with the Plaintiff about the risk of the procedure, including the increased risk of perforation. (ECF No. 31-9, Deposition of Fadi Antaki, M.D.

6

(Antaki Dep.), at p. 80, PageID.948.) Plaintiff testified that he does not recall signing any consent form for this first sigmoidoscopy. (R. Staples Dep. at p. 27, PageID.577.) When shown the signature on the form, Plaintiff testified that he was not sure if it was his signature. (*Id*.)

The primary goal of the sigmoidoscopy was to place the metal, expandable stent that Dr. Mostafa had requested, to help clear and prepare the bowel for surgery. (Schoenfeld Dep. at p. 30, PageID.809; Mostafa Dep. at pp. 34-35, PageID.745-46.) Dr. Antaki's procedure note stated that he saw an "area of narrowing at [the] junction of [the] descending and sigmoid [colon], possibly torsion or a volvulus[,] but that no obvious mass, cancer or other intrinsic pathology was seen." (Progress Notes, PageID.681-82.) Unfortunately, the partial obstruction was so large that the physicians could not place the self-expanding metal stent for surgery. (Mostafa Dep. at pp. 36-37, PageID.747-48; Schoenfeld Dep. at p. 31, PageID.810.) Instead, a smaller rectal decompression tube was successfully placed, with "the goal … to allow air or water in the transverse colon to then be able to flow out of that tube to decompress the colon." (Schoenfeld Dep. at pp. 31-32, PageID.810-11; Progress Notes, PageID.681-82.) Dr. Antaki noted that "an impression of torsion persisted at the end of the procedure." (Progress Notes, PageID.682.) Imaging taken after the

sigmoidoscopy showed "marked improvement" in the bowel gas pattern. (Radiology Records, PageID.639-40.)

Dr. Schoenfeld testified that he spoke to Plaintiff after the first sigmoidoscopy: "I told him that he needed surgery on Wednesday evening. He at that time was not prepared to go to surgery, and he felt strongly he wanted to have a definitive answer about what was causing the obstruction before he would agree to surgery." (Schoenfeld Dep. at p. 44, PageID.823.) Plaintiff asked Dr. Schoenfeld for "other options to get a definitive diagnosis before going to surgery." (*Id.*) Dr. Schoenfeld offered the option of an additional CT scan, and a gastrografin enema, a form of imaging. (*Id.*)[1] However, in order to do the gastrografin enema, the decompression tube would have to be removed. (*Id.*) A repeat sigmoidoscopy would then be performed after to reinsert the decompression tube. (*Id.*) Dr. Schoenfeld testified that the gastrografin enema was potentially useful for two reasons: (1) it could show diverticula disease at the level of obstruction; and, (2) if the blockage was an atypical presentation of a volvulus, or a twist in the colon, the enema could untwist the colon. (*Id.* at p. 79, PageID.858.)

---

[1] Dr. Mostafa explained that a gastrografin enema is "a contrast study injected in the colon, in the rectum, to delineate or pacify the colon so you would know the nature of the place, the site, the cause of the obstructing problem." (Mostafa Dep. at p. 45, PageID.756.)

8

### 6.     Thursday, November 3, 2016

Another CT scan was taken on Thursday, November 3rd. Again, the findings were consistent with an "obstructing, constricting tumor," possibly cancerous. (Radiology Records, PageID.636-39.) Dr. Mostafa and nurse practitioner Cobb again met with Plaintiff and his wife that day. (Progress Notes, PageID.673.) Plaintiff reported that he felt much better since the insertion of the rectal tube, but that he was frustrated at being told "different things" by different doctors and he was angry when told that he would need surgery soon. (*Id*.) The progress note stated that Plaintiff "became very upset with surgical resident team this AM when the possibility that the obstruction could have been caused by an obstructing malignant mass was discussed." (*Id*.) Dr. Mostafa offered to find Plaintiff an outside second opinion, or transfer Plaintiff to an outside facility, but reiterated that Plaintiff would still need surgery. (*Id*.) Dr. Mostafa explained that even if the problem was a volvulus, Plaintiff should have surgery to avoid a reoccurrence of that problem. (*Id*.) Dr. Mostafa noted that it was still not clear what was causing the obstruction. (*Id*.)

Plaintiff recalled this conversation differently. He testified that he did not refuse surgery and took exception to the bedside manner of one of the residents, which he found rude and overly aggressive. (R. Staples Dep. at p. 30, PageID.580.) Plaintiff also testified that he agreed to have the surgery in this meeting. (*Id*.)

9

Dr. Schoenfeld wrote a GI Progress Note on Thursday, documenting that he had met with Plaintiff and his wife on Wednesday and Thursday, and answered their questions. (Progress Notes, PageID.670-71.) Dr. Schoenfeld also discussed Plaintiff's management plan directly with Dr. Mostafa both days. (*Id*.) Dr. Schoenfeld wrote that the sigmoidoscopy showed "no evidence of colon ca [cancer] and volvulus seemed most likely, although this is an atypical presentation of volvulus." (*Id*.) He also noted, however, that the sigmoidoscopy was limited due to retained stool and that the newest CT scan had different findings and was "most compatible with a short segment partially obstructing, constricting tumor of the sigmoid colon." (*Id*.) Given the conflicting findings, Dr. Schoenfeld recommended a gastrografin enema, which would require removal of the rectal decompression tube, followed by a second sigmoidoscopy, during which he would replace the tube. (*Id*.)

A nursing note later that day stated that, "[p]lan is for patient to have Rectal tube discontinued by surgery in am, gastrografin enema in AM and flex sigmoidoscopy in early afternoon. Patient agreeable to plan[.]" (*Id*. at PageID.680.) Plaintiff, however, has testified that he refused the second scope, telling Dr. Schoenfeld: "I didn't want to be scoped again because it was too painful." (R. Staples Dep. at p. 32, PageID.582.)

10

### 7.     Friday, November 4, 2016

Prior to the gastrografin enema on Friday morning, November 4th, Plaintiff reported to Dr. Schoenfeld that his "abdominal discomfort had essentially resolved," that he was "passing small amounts of flatus," and that he "had tolerated small amounts of clear liquid on the previous evening." (Progress Notes, PageID.662.) The gastrografin enema was performed at about 9:30 a.m. (Radiology Records, PageID.635-36.) It showed findings again suggesting a cancerous obstructing mass. (*Id*.)

The second sigmoidoscopy was performed that afternoon, to replace the rectal tube. (Progress Notes, PageID.664.) Plaintiff's wife testified that no more than five to seven minutes elapsed between the time that Plaintiff was returned to his room from the gastrografin enema and the time he was taken to be prepped for the second sigmoidoscopy, and that he still appeared to be under sedation. (ECF No. 30-3, Deposition of Berntina Staples (B. Staples Dep.) at p. 25, PageID.262.) However, the radiology record does not indicate that Plaintiff was sedated for the gastrografin enema procedure (Radiology Record, PageID.635-36),[2] and a nursing note prior to

---

[2] Dr. Muthusamy testified that patients generally are not sedated for a gastrografin enema procedure. (ECF No. 31-12, Deposition of Arunkumar Muthusamy, M.D. (Muthusamy Dep.) at p.43, PageID.1017.)

11

the second sigmoidoscopy, but after the gastrografin enema, described Plaintiff as "[a]lert, cooperative, pleasant." (Progress Notes, PageID.667.). Plaintiff told the nurse that he was experiencing pain in his rectal area that he described as a 2 on a scale of 1-10. (*Id.*)

Dr. Schoenfeld spoke to Plaintiff prior to the sigmoidoscopy and reported that Plaintiff "noted recurrent abdominal distension and discomfort after [the] enema, but not nearly as severe as at [the] time of admission." (*Id.* at PageID.662.) There was no evidence of a perforation between the time of the gastrografin enema and the second sigmoidoscopy. (Schoenfeld Dep. at p. 56, PageID.835.)

Dr. Arunkumar Muthusamy, a fellow at the hospital, obtained the informed consent from Plaintiff for the second sigmoidoscopy at approximately 11:50 a.m., while supervised by Dr. Schoenfeld. (Progress Notes, PageID.664-65; ECF No. 31-10, 11/4/2016 Consent Form, PageID.969-73.) Dr. Muthusamy testified at his deposition that he had no memory of Plaintiff, his clinical course, of obtaining the consent, or of the day in question, but confirmed that it was his signature on the consent form. (ECF No. 31-12, Deposition of Arunkumar Muthusamy, M.D. (Muthusamy Dep.) at pp. 23, 25, 31, 34, 37-38, PageID.997, 999, 1005, 1008, 1011-12.) Plaintiff testified that he has no memory of signing the second consent. (R. Staples Dep. at pp. 39-40, PageID.589-90.) When shown the signature on the form,

12

Plaintiff testified that he did not recognize it. (*Id*.) While Plaintiff admitted that the form listed "[t]ear in the wall of the colon" as a risk of the sigmoidoscopy, he also reiterated that he had never seen the form previously. (*Id*. at pp. 40-41, PageID.590-91.)

The second sigmoidoscopy was performed by Dr. Schoenfeld and Dr. Antaki. (Progress Notes, PageID.661-63.) Dr. Antaki wrote that "[t]he views were good. The patient's toleration of the procedure was good." (*Id*.) The scope showed, "a segment of severe diverticulosis, in the left colon" and noted, "[c]omplicated diverticular disease is the most likely etiology, however a submucosal tumor is not ruled out." (*Id*.) The tube/drain was replaced. (*Id*.) Dr. Antaki noted: "Will need a surgical intervention soon." (*Id*.)

After the procedure Dr. Schoenfeld told Plaintiff that the obstruction was due to diverticulitis and that he was going to have to have surgery. (*Id*. at PageID.663; Schoenfeld Dep. at p. 81, PageID.860.) Dr. Schoenfeld and Dr. Mostafa discussed a tentative plan to perform colon surgery on Monday, "assuming patient is stable over the weekend." (Progress Notes, PageID.662-63.)

At about 7 p.m. that evening, Dr. Schoenfeld conducted a "final postprocedure check" on Plaintiff and found on physical examination that Plaintiff had abdominal distention and was complaining of increased abdominal discomfort. (Schoenfeld

13

Dep. at pp. 54-55, PageID.833-34.) Dr. Schoenfeld asked a nurse to page the surgery resident, told the resident that he believed Plaintiff had a perforated colon, and asked the resident to obtain an abdominal x-ray. (*Id*.) X-ray studies showed "free air" under Plaintiff's diaphragm, confirming the perforation. (*Id*.; Radiology Records, PageID.632-33.)

### 8.    Saturday, November 5, 2016

Chief surgical resident Alicia Olson returned to the hospital late Friday evening to evaluate Plaintiff. (Progress Notes, PageID.655-56.) She reviewed the imaging and records, diagnosed Plaintiff with a perforated colon, and told him that he needed emergency surgery. (*Id*.) She reported that Plaintiff would not consider surgery until he spoke with Dr. Schoenfeld. (*Id*.; Mostafa Dep. at pp. 60-61, PageID.771-72.) Dr. Olson called Dr. Schoenfeld at home around midnight, and informed him that Plaintiff was not willing to go to surgery without asking Dr. Schoenfeld if surgery was absolutely necessary. (Schoenfeld Dep. at p. 75, PageID.854.) Dr. Schoenfeld told Plaintiff that his colon had perforated and "he absolutely had to go to surgery." (*Id*.) He stated that Plaintiff would have died had he not had the surgery. (*Id*. at p. 76, PageID.855.)

Plaintiff, however, testified that he "never" refused to have surgery, (R. Staples Dep. at pp. 45-46, PageID.595-96), and only wanted to call Dr. Schoenfeld

to ask "what did he do to me[?]" (*Id*. at p. 42, PageID.592.) Plaintiff testified that Dr. Schoenfeld "told me that he ruptured my colon. He's sorry that it happened, and that he would – I would have to live with it the rest of my life. And hung up the phone." (*Id*. at pp. 42-43, PageID.592-93.)

Dr. Mostafa performed a sub-total colectomy on Plaintiff, removing all of Plaintiff's colon except a portion of his sigmoid colon (the portion closest to the rectum) and the rectum. (Schoenfeld Dep. at pp. 59-60, PageID.838-39.) Dr. Schoenfeld testified that a sub-total colectomy was always a possible outcome of the obstruction. (*Id*. at pp. 64-65, PageID.843-44.)

When asked if he believed the perforation of Plaintiff's cecum was caused by the sigmoidoscopy, Dr. Mostafa said, "I do not believe that." (Mostafa Dep. at pp. 42-43, PageID.753-54.) Rather, he testified that the perforation was caused by "high pressure over time," an ischemic event. (*Id*.) "I believe it was a gradual buildup of ischemic event in the cecum." (*Id*. at p. 61, PageID.772.) Dr. Mostafa also did not believe the GI team tried to "hide" the fact that Dr. Mostafa preferred surgery over the enema and second sigmoidoscopy, and that Plaintiff was aware of Dr. Mostafa's preference. (*Id*. at pp. 47-48, 52, PageID.758-59, 763.)

Dr. Schoenfeld testified that Plaintiff was unwilling to consent to surgery until Saturday. (Schoenfeld Dep. at pp. 73, 75-76, PageID.852, 854-55.) Dr. Mostafa

agreed, testifying that Plaintiff refused to be put on the surgical schedule after the first sigmoidoscopy because Plaintiff did not believe that he needed surgery. (Mostafa Dep. at p. 51, PageID.762.) When asked if there was any point prior to Saturday when Plaintiff was willing to have surgery, Dr. Mostafa testified, "No, not in my opinion." (*Id*. at p. 60, PageID.771.)

### B.    Procedural Background

On July 2, 2019, Plaintiffs brought this medical malpractice claim against the United States through the Federal Tort Claims Act (FTCA) based on the care Plaintiff Ronald Staples received at the Detroit VA Hospital. (ECF No. 1, Complaint.) Plaintiff claims that his colon was perforated during a procedure performed by Defendant's physicians (a sigmoidoscopy), but it was not diagnosed or repaired in time, resulting in additional procedures, including the removal of a significant portion of his colon and digestive tract, which has resulted in permanent gastrointestinal disability. Plaintiff claims that certain physicians breached the applicable standard of care when treating him.

Plaintiff Ronald Staples now moves for partial summary judgment. (ECF No. 30, Pl's. Mot.) Plaintiff argues that two physicians employed by Defendant at the Detroit VA Hospital, Drs. Mostafa and Muthusamy, have testified that the second sigmoidoscopy should not have been performed given Plaintiff's discomfort and

distended abdomen following the gastrografin enema, and that based on these "admissions," there is no genuine issue of material fact that the standard of care was breached and the second sigmoidoscopy should not have been performed. Plaintiff also argues that Dr. Muthusamy breached the standard of care when he failed to warn Plaintiff of the increased risks of the second sigmoidoscopy given Plaintiff's discomfort and distended abdomen following his gastrografin enema.

Defendant filed a Response in opposition, arguing that Plaintiffs' motion should be denied because genuine issues of material fact exist. Defendant asserts that its expert will testify that Defendant's physicians acted within the standard of care, and Plaintiff's expert will testify that the gastrografin enema and second sigmoidoscopy procedures should not have been performed, and that these opposing opinions create a question of fact that requires the case to be tried. Defendant asserts that Dr. Muthusamy was not equipped to give an opinion on the standard of care because he testified that he had no memory of and was not involved in Plaintiff's care. Dr. Mostafa did not testify to a breach of the standard of care, and, in any event, he was not qualified to give a standard of care opinion regarding the gastroenterology procedure because he was not a board certified gastroenterologist. Defendant asserts that there is a question of fact as to whether Plaintiff gave informed consent for the second sigmoidoscopy – Defendant produced the signed informed consent and

17

Plaintiff denies signing the form. Finally, Defendant argues that Plaintiff has failed to provide any expert testimony that Defendant breached the standard of care in relation to the informed consent given prior to the second sigmoidoscopy.

Plaintiff filed a reply brief, reasserting that the second sigmoidoscopy should not have been performed, and that there was inadequate informed consent for that procedure, based on the "admissions" of Defendant's agents and employees. Plaintiff argues that Dr. Muthusamy was given responsibility for obtaining Plaintiff's informed consent, but he testified that he did not know of Plaintiff's pain and distention at that time and thus did not advise Plaintiff that the procedure should not be performed.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). A fact is "material" for purposes of a summary judgment motion where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)).  A dispute over a material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A moving party with the burden of proof faces a "substantially higher hurdle"

on a motion for summary judgment. *Arnett v. Myers,* 281 F.3d 552, 561 (6th

Cir.2002); *Cockrel v. Shelby Cnty. Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir. 2001).

The moving party *without* the burden of proof needs only show that the opponent

cannot sustain his burden at trial. "But where the moving party has the burden—the

plaintiff on a claim for relief or the defendant on an affirmative defense—his

showing must be sufficient for the court to hold that no reasonable trier of fact could

find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259

(6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal*

*Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487-88 (1984)).

The Court of Appeals has repeatedly emphasized that the party with the burden of

proof faces "a substantially higher hurdle" and "'must show that the record contains

evidence satisfying the burden of persuasion and that the evidence is so powerful

that no reasonable jury would be free to disbelieve it.'" *Arnett,* 281 F.3d at 561

(quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL

PRACTICE § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel,* 270 F.3d at 1056 (same).

Accordingly, a summary judgment in favor of the party with the burden of

persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999). This higher summary judgment standard applies to Plaintiffs' motion for partial summary judgment.

"The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal citations and quotation marks omitted). The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote and internal quotation marks omitted).

In making the determination on summary judgment whether there are genuine issues of material fact for trial, the court must draw all reasonable inferences in favor of the non-moving party. *See Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

## III.  ANALYSIS

### A.    FTCA Medical Malpractice Claims

"Absent waiver, the doctrine of sovereign immunity insulates the government from suit." *Department of the Army v. Blue Fox*, 525 U.S. 255, 260 (1998) (citing *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994)). With the enactment of the Federal Torts Claims Act (FTCA), Congress waived the government's sovereign immunity for claims against it for monetary damages arising from "'personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant.'" *Matthews v. Robinson*, 52 F. App'x 808, 809 (6th Cir. 2002) (quoting 28 U.S.C. § 1346(b)). "Liability under the FTCA is determined

by reference to the law of the state where the alleged medical malpractice or negligence occurred." *Shedden v. U.S.*, 101 F. App'x 114, 115-16 (6th Cir. 2004) (citations omitted). Because all of the alleged acts and omissions in this case occurred in the state of Michigan, its laws apply. *Brown v. United States,* 583 F.3d 916, 920 (6th Cir. 2009); *see also* 28 U.S.C. § 1346(b)(1).

To establish a claim of medical malpractice in Michigan, a plaintiff must set forth "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care." *Craig ex rel. Craig v. Oakwood Hosp.*, 471 Mich. 67, 86 (2004) (footnote omitted); *see also* MCL § 600.2912a. "As a general rule, Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care and causation." *Kava v. Peters*, 450 F. App'x 470, 475 (6th Cir. 2011) (citing *Pennington v. Longabaugh*, 271 Mich. App. 101, 104 (2006) and *Thomas v. McPherson Cmty. Health Ctr.*, 155 Mich. App. 700, 705 (1986)). This is because, in medical malpractice cases, issues of negligence and causation are normally beyond the knowledge of laymen. *Baldwin v. Williams*, 104 Mich. App. 735, 738 (1981). However, an "expert opinion based upon only hypothetical situations is not enough

to demonstrate a legitimate causal connection between a defect and injury." *Kernstock v. U.S.*, 559 F. App'x 428, 433-34 (6th Cir. 2014) (quoting *Skinner v. Square D. Co.*, 445 Mich. 155, 173 (1994)). Instead "there must be facts in evidence to support the opinion testimony of an expert." *Skinner*, 445 Mich. at 173.

**B.    Whether Plaintiff Established That The Second Sigmoidoscopy Breached The Standard Of Care**

Plaintiff argues that he is entitled to partial summary judgment concerning Defendant's breach of the standard of care with respect to the performance of the second sigmoidoscopy, and with respect to Defendant's failure to provide the information necessary for Plaintiff to give informed consent with respect to that procedure. As Defendant properly explains, the "heart" of Plaintiff's case is that he should have had surgery instead of the gastrografin enema and the second sigmoidoscopy, and that Defendant's performance of these diagnostic procedures breached the standard of care. (Def.'s Resp. at p. 15, PageID.538.) Because Plaintiff bears the burden of proof on his claim, he "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. The Court finds that Plaintiff fails to meet this burden for several reasons.

First, Defendant points to record evidence throughout Plaintiff's treatment at the VA Hospital that he repeatedly refused to have the recommended surgery, and instead opted for the diagnostic procedures to attempt to identify the cause of the colonic obstruction. (*See* Progress Notes, PageID.673, 683-84, 692-93, 702; Mostafa Dep. at pp. 51, 60, PageID.762, 771; Schoenfeld Dep. at pp. 44, 73, 75-76, PageID.823, 852, 854-55.) That Plaintiff has testified that he never refused surgery and that he did not want the second sigmoidoscopy creates a disputed issue of fact for the jury to decide.

Second, Defendant's retained expert gastroenterologist, Dr. Tadd Hiatt, opines that Defendant's physicians acted within the standard of care in offering and performing the diagnostic procedures. (ECF No. 31-12, Tadd Hiatt, M.D. Reports, PageID.1033-39.) Dr. Schoenfeld similarly stated that the second sigmoidoscopy procedure was within the applicable standard of care. (ECF No. 31-13, Declaration of Dr. Philip Schoenfeld, at ¶¶ 9-25, PageID.1041-43.) Plaintiff's retained expert, Dr. Stephen Siegel, opines that the procedures should not have been performed. (ECF No. 31-14, Stephen Siegel, M.D. Reports, PageID.1044-47.) Viewing this record evidence in the light most favorable to Defendant, the conflicting opinions create a disputed issue of fact, precluding summary judgment for Plaintiff on whether Defendant's physicians breached the applicable standard of care.

24

Plaintiff does not address these expert opinions in his motion, but instead argues that the deposition testimony of Dr. Mostafa and Dr. Muthusamy constitute "admissions" that the second sigmoidoscopy should not have been performed on him. Contrary to Plaintiff's contention, Dr. Muthusamy did not testify that the second sigmoidoscopy should not have been performed on Plaintiff. Rather, he testified that he had no memory of Plaintiff or the procedure in question, and that he had not reviewed Plaintiff's medical records in advance of the deposition. (Muthusamy Dep. at pp. 14, 25, 30, 34, 37-38, PageID.988, 999, 1004, 1008, 1011-12.) He further testified that he was not involved with Plaintiff's care aside from securing Plaintiff's informed consent for the second sigmoidoscopy. (*Id.* at p. 29, PageID.1003.) Thus, Dr. Muthusamy did not opine regarding the applicable standard of care for performing the sigmoidoscopy on Plaintiff in this case.

The deposition testimony Plaintiff relies on as Dr. Muthusamy's "admissions" contains Dr. Muthusamy's responses to hypothetical questions posed by Plaintiff's counsel pertaining generally to gastrografin enemas or informed consent. (See Muthusamy Dep. at pp. 50-51, PageID.1024-25.) Specifically:

Q.   If, in fact, the patient underwent a gastrografin enema and following the enema the patient was feeling uncomfortable, had some pain, experienced some distension, would you believe that a sigmoidoscopy would be appropriate at that time?

***

A.    No, not at that time.

Q.    All right. Thank you. Now if you were giving an informed consent – or strike that. If you were trying to obtain an informed consent for a patient to undergo a sigmoidoscopy following a gastrografin enema and the patient voiced some of these complaints that we've been talking about, do you believe that as a gastroenterologist you should explain any additional risks to the patient if the patient was to undergo a sigmoidoscopy?

A.    Yes.

Q.    Okay. What additional risks do you believe the patient should be advised of?

A.    Perforation and bleeding, infection.

(Muthusamy Dep. at pp. 50-51, PageID.1024-25.) In short, these deposition testimony excerpts are not specific to *Plaintiff's* second sigmoidoscopy, or his care by Defendant's physicians, and thus do not constitute admissions by Dr. Muthusamy that the standard of care was breached *in this case* because an expert must have a medical basis for his opinion and relate it to the patient's symptoms. *See Teal v. Prasad*, 283 Mich. App. 384, 395-96 (2009) (noting that "an 'expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and injury,' and 'there must be facts in evidence to support the opinion testimony of an expert.'") (quoting *Skinner*, 445 Mich. at 173); *Wolford v. Duncan*, 279 Mich. App. 631, 638-39 (2008). As explained above, Dr.

26

Muthusamy testified that he had no memory of Plaintiff or the day in question, he was not involved in Plaintiff's care aside from securing the consent, and he did not review Plaintiff's medical records prior to his deposition.

Similarly, Dr. Mostafa did not testify that Defendant's physicians breached the standard of care by performing the second sigmoidoscopy on Plaintiff instead of proceeding directly to surgery. First, Dr. Mostafa testified that he advised Plaintiff multiple times that he needed to undergo surgery, but Plaintiff "didn't believe he needed surgery," and Dr. Mostafa acknowledged that Plaintiff could not be taken to surgery without his consent. (Mostafa Dep. at p. 51, PageID.762.) And, as above, the deposition testimony Plaintiff relies upon as Dr. Mostafa's "admissions" constitutes Dr. Mostafa's responses to hypothetical and general questions:

> Q. But if, in fact, following the gastrografin enema, the patient experiences abdominal distention, complains of it, complains of discomfort and pain, that would be another reason, like in this patient, not to do the second sigmoidoscopy, but rather, take the patient to surgery, right?
>
> A. Correct.
>
> Q. And when discussing this with the patient, the patient – because when you discuss it with the patient, you're trying to get an informed consent, which means that you want to tell the patient the risks, the benefits and the reasonable alternatives of the treatment plan; is that right?
>
> A. Yes.

27

***

Q.   Well, okay. If the gastroenterologist or the person from the gastroenterology served was trying to obtain the informed consent and realized and knew that for whatever reason, based on the presentation of the patient, that a second sigmoidoscopy posed certain risks over and above the risks that the patient was subjected to during the first sigmoidoscopy, the patient should have been advised of that, right?

A.   Like we do with all our patients, if I believe what I am going to do to the patient, for the patient, will impose risk that should have been avoided by not doing it or with another alternative, I should tell the patient.

(Mostafa Dep. at pp. 46-48, PageID.757-79.) These were not, as Plaintiff characterizes them, "clear and unequivocal statements relative to the standard of care applicable to Mr. Staples condition on November 4, 2106." (See Pl.'s Mot. at p. 4, PageID.228.) Dr. Mostafa in fact testified that the additional diagnostic tests (the gastrografin enema and sigmoidoscopy) "were, in my opinion, unnecessary, waste of time, not needed. Now, are they going to endanger this patient's life? No[,]" that the gastrografin enema did not pose any risk and was even "a really good test for any perforation" because it is so benign, and that performing a second sigmoidoscopy days after the first one did not pose any additional risk to Plaintiff. (Mostafa Dep. at pp. 17, 42, 45-46, 64, PageID.728, 753, 756-57, 775.)

Further, Dr. Mostafa is a board-certified surgeon, but he is not board certified in gastroenterology (Mostafa Dep. at p. 6, PageID.717), and thus he may not offer opinion testimony that Dr. Schoenfeld, a board-certified gastroenterologist, breached the applicable standard of care with regard to the gastroenterology procedure. *See Halloran v. Bhan*, 470 Mich. 572, 577 (2004) (holding that "M.C.L. § 600.2169(1)(a) requires that an expert witness share the same board certification as the party against whom or on whose behalf the testimony is offered.").

Accordingly, the Court finds that Plaintiff has not met his burden to establish that "the record contains evidence satisfying [his] burden of persuasion [that Defendant breached the standard of care with respect to the second sigmoidoscopy] and that the evidence is so powerful that no reasonable jury would be free to disbelieve it," *see Arnett*, 281 F.3d at 561, and denies Plaintiff's motion with respect to this claim.

### C. Whether Plaintiff Establishes That The November 4, 2016 Informed Consent Breached The Standard Of Care

"The doctrine of informed consent requires a physician to warn a patient of the risks and consequences of a medical procedure." *Wlosinski v. Cohn*, 269 Mich. App. 303, 308 (2005). Plaintiff did not testify that he was given *inadequate* consent, such that he would not have proceeded with the second sigmoidoscopy if he had

been better informed of the risks. Rather, Plaintiff testified that he did not give *any* consent for the second sigmoidoscopy procedure because he "didn't want to be scoped again because it was too painful," but that Dr. Schoenfeld "just kept insisting on [him] being scoped." (R. Staples Dep. at pp. 32, 38, PageID.582, 588.) Plaintiff denied that he ever saw or signed the November 4th Informed Consent. (*Id.* at pp. 39-41, PageID.589-91.) While Plaintiff may try to argue that he did not give consent for the second sigmoidoscopy, Defendant has presented a copy of the Informed Consent with Plaintiff's purported signature, and with Dr. Muthusamy's signature. (11/4/2016 Informed Consent, PageID.969-73.) That Consent includes explanations of the risks of the sigmoidoscopy procedure, including tear in the wall of the colon and death. (*Id.*) Whether, based on the disputed testimony and evidence, Plaintiff was presented with this Informed Consent, and whether he signed it, are fact issues for the jury to decide, precluding summary judgment for Plaintiff.

Even if Plaintiff acknowledged that he signed the Consent and argued that he should have been given a more fulsome explanation of the risks given his clinical presentation, he would be required to present evidence to show the inadequacy of the informed consent such that "no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. The Informed Consent produced in this case, purportedly signed by Plaintiff and signed by Dr. Muthusamy, includes explanations of the risks

of the sigmoidoscopy procedure, including "[t]ear om the wall of the colon" and death. (11/4/2016 Informed Consent, PageID.969-73.) This record evidence raises questions of fact about whether the consent was given, and the adequacy of the consent, precluding summary judgment for Plaintiff.

Dr. Schoenfeld testified that he was aware of Plaintiff's report of some increased discomfort and pain following the gastrografin enema, prior to the second sigmoidoscopy, but that he did not find such symptoms unusual for a patient with Plaintiff's clinical course, and that he did not believe they increased the risk for the procedure or required warnings outside of the standard informed consent. (Schoenfeld Decl. ¶¶ 10-23, PageID.1041-43.) Plaintiff relies on excerpts of Dr. Muthusamy's and Dr. Mostafa's deposition testimony in support of his motion, but, as explained above, that testimony consists of the doctors' responses to hypothetical questions, which are insufficient to establish causation here. *See Teal*, 283 Mich. App. at 395-96; *Wolford*, 279 Mich. App. at 638-39. This deposition testimony fails to state that Dr. Schoenfeld breached the standard of care, fails to give a medical basis for such a purported opinion, and fails to relate that opinion to Plaintiff's symptoms. Indeed, Dr. Muthusamy testified repeatedly that he had no memory of Plaintiff or the day in question, and thus he could not offer an opinion on the standard of care as applied to Plaintiff. Further, Dr. Mostafa was not involved in the informed

consent for the second sigmoidoscopy, was not present for the consent or the procedure, and is not a board-certified gastroenterologist qualified to give opinion testimony regarding this procedure as applied to Plaintiff.

Finally, Plaintiff's gastroenterologist expert, Dr. Siegel, did not opine that Dr. Schoenfeld, or anyone else, breached the standard of care with regarding to obtaining Plaintiff's informed consent for the second sigmoidoscopy. (ECF No. 31-14, Siegel Reports, PageID.1044-47; ECF No. 31-15, Deposition of Stephen R. Siegel, M.D. (Siegel Dep.) at pp. 77-79, PageID.1124-26.) Dr. Siegel opined that Dr. Schoenfeld breached the standard of care in performing the second sigmoidoscopy, but that he did not see any breach by anyone else involved in Plaintiff's care. (Siegel Dep. at pp. 78-79, PageID.1125-26.)

Accordingly, the Court denies Plaintiff summary judgment on this claim.

## IV.  CONCLUSION

For the reasons set forth above, and taking the evidence in the light most favorable to the non-moving party, Plaintiff's Motion for Partial Summary Judgment is DENIED.

IT IS SO ORDERED.

Dated: August 9, 2021                          s/Paul D. Borman
                                               Paul D. Borman
                                               United States District Judge